Lawrence Katz, Esq.
Law Offices of Lawrence Katz,
464 Malbone Street, Suite 101
Brooklyn, NY 11225
516-374-2118

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Y.Y., | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : Civil Action No.: 24-8401 |
| | : |
| KELLY MAYER- REGALBUTO; PATRICIA | : |
| AUFIERO; NICOLE ELMERA; NEW MILFORD | : |
| BOARD OF EDUCATION a/k/a NEW MILFORD | : |
| PUBLIC SCHOOL DISTRICT; KIMBERLY | : |
| ROBERTS; VERONICA ZERON, and SUSAN | : |
| LENNON, | : |
| | : |
| *Defendants.* | : |

## PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION TO DISMISS BY DEFENDANTS KELLY MAYER- REGALBUTO, PATRICIA AUFIERO, NICOLE ELMERA, AND NEW MILFORD BOARD OF EDUCATION A/K/A NEW MILFORD PUBLIC SCHOOL DISTRICT

**Lawrence Katz, Esq.**

**Law Offices of Lawrence Katz,**

**464 Malbone Street, Suite 101**

**Brooklyn, NY 11225**

**Attorney for Plaintiff**

Page i

# Contents

BACKGROUND ................................................................................................. 1

PROCEDURAL HISTORY ............................................................................... 7

STANDARD OF REVIEW ............................................................................... 7

I.THE DEFENDANTS CAUSED PLAINTIFF MULTIPLE CONCRETE INJURIES. .9

II.       MAYER AND AUFIERO ACTED UNDER THE COLOR OF LAW ............... 11

III.      PLAINTIFF'S DISABILITY IS A PROTECTED CLASS ................................ 15

IV.       PLAINTIFF HAS ADEQUATELY PLED THE LIABILITY OF THE SCHOOL. ........................................................................................................ 17

V.        DEFENDANTS KNEW THAT THE FABRICATED REPORT CAUSED ROBERTS AND ZERON WERE INTERFERING WITH PLAINTIFF'S CONSTITUTIONAL RIGHTS BUT DID NOTHING TO STOP IT. ................................................... 23

VI.       PLAINTIFF HAS ALLEGED VALID CLAIMS FOR RECOVERY FOR HIS DENIAL OF EDUCATION DUE TO A DISABILITY. ..................................................... 24

VII.      PLAINTIFF ADEQUATELY ALLEGED A DEFAMATION AGAINST MAYER AND AUFIERO ................................................................................................... 27

CONCLUSION .................................................................................................. 30

## 1. Cases

*A.W. v. Jersey City Pub. Schs.*,
   486 F.3d 791 (3d Cir. 2007) ................................................................... 25

*Abigail P. through Sarah F. v. Old Forge Sch. Dist.*,
   105 F.4th 57 (3d Cir. 2024) ................................................................... 26

*Ali v. Woodbridge Twp. Sch. Dist.*,
   957 F.3d 174 (3d Cir. 2020) ................................................................... 30

*Arturi v. Tiebie*,
   73 N.J. Super. 217, 179 A.2d 539 (App. Div. 1962) ............................. 29

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 8

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,
   520 U.S. 397 (1997) ............................................................................... 19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 8

*Black v. Montgomery Cnty.*,
   835 F.3d 358 (3d Cir. 2016) .................................................................... 9

*Bonenberger v. Plymouth Twp.*,
  132 F.3d 20 (3d Cir. 1997) ................................................................. 12

*C.H. ex rel. M.H. v. Jefferson Twp Bd of Educ.*,
  No. CIV.A.05-39(HAA), 2005 WL 4122172 (D.N.J. Dec. 20, 2005) ...................... 26

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005) ................................................................ 10

*Chambers v. York Cnty. Prison*,
  No. 1:18-CV-2386, 2021 WL 1212532 (M.D. Pa. Mar. 31, 2021) ...................... 12

*Clark v. Clabaugh*,
  20 F.3d 1290 (3d Cir. 1994) ................................................................ 23

*Connick v. Thompson*,
  563 U.S. 51 (2011) .......................................................................... 22

*Crump v. Passaic Cnty.*,
  No. 2:14-2365 WHW, 2015 WL 1034653 (D.N.J. Mar. 9, 2015) ...................... 10

*D.R. v. M.R. v. E. Brunswick Bd. of Educ.*,
  109 F.3d 896 (3d Cir. 1997) ................................................................ 26

*Edmonson v. Leesville Concrete Co.*,
  500 U.S. 614 (1991) ........................................................................ 14

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*,
  580 U.S. 386 (2017) ........................................................................ 25

*Est. of Roman v. City of Newark*,
  914 F.3d 789 (3d Cir. 2019) ................................................................ 28

*Fry v. Napoleon Cmty. Sch.*,
  580 U.S. 154 (2017) ........................................................................ 25

*Gonzalez v. Trevino*,
  602 U.S. 653 (2024) ........................................................................ 24

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) ................................................................ 11

*Halsey v. Pfeiffer*,
  750 F.3d 273 (3d Cir. 2014) ................................................................. 9

*Hyman v. Rosenbaum Yeshiva of N. Jersey*,
  258 N.J. 208, 537 A.3d 1260, 1276 (2024) .............................................. 29

*Johnson v City of Shelby, Miss.*,
  574 US 10 (2014) ........................................................................ 8, 10

*L.A. v. New Jersey Div. of Youth & Fam. Servs.*,
  217 N.J. 311, A.3d 553 (2014) ............................................................. 13

*Lake v. Arnold*,
  112 F.3d 682 (3d Cir. 1997) ................................................................ 17

*Luna Perez v. Sturgis Pub. Sch.*,
    598 U.S. 142 (2023) ............................................................................. 25, 27

*Mark v. Borough of Hatboro*,
    51 F.3d 1137 (3d Cir. 1995) ................................................................. 14, 20

*McCain v. Des Moines*,
    174 U.S. 168 (1899) ...................................................................................... 12

*McClendon v. Sch. Dist. of Phila.*,
    No. 04–1250, 2004 WL 2440661 (E.D.Pa. Oct. 29, 2004) .................... 26

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978) ...................................................................... 18, 20, 22

*Moore v. City of E. Cleveland, Ohio*,
    431 U.S. 494 (1977) ...................................................................................... 11

*Romaine v. Kallinger*,
    109 N.J. 282, 537 A.2d 284 (1988) ............................................................ 29

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ...................................................................................... 11

*Y.W. v. New Milford Pub. Sch.*,
    No. A-5978-12T4, 2014 WL 4636380 (N.J. Super. Ct. App. Div. Sept. 18, 2014)................ 27

### 3. Statutes

20 U.S.C.A. § 1413 ............................................................................................ 17

20 USC § 1415 .................................................................................................. 25

20 USC 1401 ..................................................................................................... 25

20 USCA § 1414 .................................................................................................. 1

42 U.S.C. § 12133 ............................................................................................. 24

42 U.S.C. § 1983 ............................................................................................... 26

42 U.S.C.1985 ....................................................................................... 17, 23, 24

42 USC 12101 ................................................................................................... 24

42 USC 1983.......................................................................................... 12, 18, 20, 21

42 USC 1986............................................................................................... 17, 23

N.J.S.A. 9:6-8.10.................................................................................. 12, 13, 14, 15

### 4. Rules

Fed. Rule Civ. Proc. 8(a)(2)....................................................................... 7, 8, 17, 27

### 5. Other Authorities

Black's Law Dictionary, 2nd Edition, 1910 ............................................................ 12

Patch, *Inner Bridge Crossing Presentation*,
    https://patch.com/new-jersey/newmilford-nj/inner-bridge-crossing-presentation ................... 18

Plaintiff submits this brief in opposition to the Motion to Dismiss by Defendants Kelly Mayer-Regalbuto ("Mayer"), Patricia Aufiero ("Aufiero"), Nicole Elmera ("Elmera"), and New Milford Public School District ("School", collectively "Defendants").[1]

## **BACKGROUND**

1.    At the age of 5, Plaintiff enrolled in the New Milford Public School ("School") system.  As a resident of New Milford, Plaintiff had the unequivocal right to an education paid and provided by the School.

2.    An IEP was consummated to provide an individualized education program ("IEP") to Plaintiff being diagnosed as "Learning Language Disabled" that prevented him from speaking in *complete* sentences.  Prior to making the IEP, the School evaluated Plaintiff by a medical professional to reach the conclusion that Plaintiff is "Learning Language Disabled," pursuant to 20 USCA § 1414(a). The Plaintiff 's diagnosis included social, relational and communicative disabilities, Asperger's Syndrome, high-functioning autism, and nonverbal learning disabilities. These special needs required Plaintiff to be monitored closely by a behavioral specialist, for which the School assigned Elmera.

3.    Under the IEP, for the academic year of 2010-2011, Plaintiff was enrolled in the Inner Bridge Crossing ("IBC") program, the proper program for Plaintiff's disabilities. The IBC was created to comply with the requirement that children with learning-language disabilities are educated in the least restrictive environment.  The IBC program was designed to serve children with social, relational and communicative disabilities, including Asperger's Syndrome, high-functioning autism, and nonverbal learning disabilities. The IBC was developed in 2009 starting

---

[1] Plaintiff expects to address at the Initial Conference the Defendants contentions over Plaintiff's use of initials.  Plaintiff seeks leave to file a motion for such protective order.

with Pre-K and has since grown to meet the needs of students K-12. The IBC also provided a smaller classroom of about six (6) children, where each child has the individualized attention to nourish the child's development, and the IBC provided an environment where the children were able to relate and connect with each other.

4.      The plaintiff was assigned to the classroom of Kevin Flynn (Flynn) and was one of six (6) students in Flynn's IBC class.  The School conveyed to Plaintiff's parents that Flynn would continue working with Plaintiff's class after first grade and continue so in each grade.

5.      During the academic year of 2010-2011, Plaintiff excelled in the IBC program and enjoyed his education and was thriving at exceptional levels.  In that year, while attending the IBC, Plaintiff was able to complete the requisite academic education at a mainstream level with minimal intervention. Flynn worked with the children based on their enthusiasm about the educational material and worked with the material on an individual child's strengths.  However, Aufiero and Elmera insisted that Flynn limit his academic freedom to the model of Applied Behavior Analysis (ABA), a model Flynn found did not work for Plaintiff.

6.      Plaintiff's parents concurred with Flynn's finding and asked Elmera not to use ABA for Plaintiff.  The School directed Aufiero and Elmera on following the ABA model since the State and insurance acknowledge and reimburse only ABA treatment, whereas other treatments, albeit effective, do not receive the extra funding.

7.      The ABA is a controversial learning model, built on a structured model of the discipline of reward that a child on the spectrum of autism can be made to learn by offering rewards for positive feedback, or withholding a reward on negative feedback.  ABA is based on the idea that reinforcing certain behaviors with a reward will lead kids to repeat those behaviors.  Such as, allowing a child to play with the color object the child chooses, if the child articulates in a complete

sentence the request for a given color. ABA also focuses on eliminating behaviors, using the model of rewards. The issue with the ABA model is that children on the spectrum, such as was the case with Plaintiff, often struggle with the idea of cause and effect, such as the consequences of good and bad behavior. That is because ABA is guided by manipulating the child to act in a particular way, which many children on the autistic spectrum do not have the cognitive understanding to follow. Thus, the ABA model, rather than educating a child on the spectrum, can frustrate the child to great levels, where he or she does not understand the reason for being deprived of the object that the teacher intended to be a reward.

8.      Flynn, having tested the ABA model within the IBC students, was unwilling to continue subjecting Plaintiff to the restrictive nature of the ABA, having seen firsthand that the ABA model frustrates his students. As a direct result, Aufiero and Elmera orchestrated the termination of Flynn.

9.      For the following academic year, for the academic year of 2011-2012, Aufiero and Elmera unilaterally removed Plaintiff from the IBC program and placed him in the classroom of Kelly Mayer-Regalbuto (Mayer). This was a breach of the IEP that Plaintiff's parents had with the School. Aufiero and Elmera falsely proclaimed that the IBC ceased due to the termination of Flynn. The allegation was false, as it turned out the IBC program continued and continues to date. The reason Aufiero and Elmera removed Plaintiff from the IBC is that the Plaintiff was not amenable to the ABA system, whereas the School preferred employing the ABA.

10.     This placing Plaintiff into the classroom of Mayer by Elmera separated Plaintiff from peers, with whom he had gotten along and was succeeding while in class together. The act by Elmera and Aufiero was designed to isolate Plaintiff from having any friends with whom he could relate. At the same time, Mayer was not trained nor experienced with education for

individuals diagnosed with any of the diagnoses of Plaintiff. Mayer's classroom was for children who were not on the autistic spectrum but had physical disabilities.

11.    Mayer did not want Plaintiff in her classroom. Mayer openly stated to Plaintiff's parents that she did not have the qualifications nor the means to provide an education for Plaintiff. The Plaintiff found himself isolated in Mayer's classroom and unable to relate to the learning environment of the Mayer's classroom. The Plaintiff was getting admonished and ridiculed for being autistic. As a direct result, in the very years of his developmental stage, Plaintiff developed extreme anxiety about the situation and would spend every day crying and sobbing for hours, and yet unable to articulate his frustrations due to his learning disabilities.

12.    The Plaintiff's parents were frustrated by this malpractice deployed by the Defendants repeatedly asked Aufiero and Elmera to correct the error by returning Plaintiff to the IBC program, and yet Aufiero and Elmera paid no attention to Plaintiff's state of mistreatment.

13.    To make matters worse, for the following academic year of 2012-2013, the School made Plaintiff continue another year in the classroom of Mayer. Thereafter, Mayer became hostile to Plaintiff and orchestrated a scheme to personally injure Plaintiff in the hopes of having Plaintiff removed from her classroom. Mindful, the Plaintiff at the time was seven (7) years old.

14.    On February 1, 2013, Mayer fabricated a false report that was transmitted to the Division of Child Protection and Permanency (DCPP), concerning Plaintiff. The report stated that in the course of reading a social studies book about "American Indians," Plaintiff supposedly said: the children were 'touching their dad'. The false report added that Plaintiff touches his father (Y.W.) and that doing it is "a secret" and that Plaintiff gets a "special surprise from it." Mayer added that this information was not solicited and was alleged to be the only comments that Plaintiff made about this book. The false report fabricated by Mayer and transmitted by Aufiero to a state

hotline of child abuse, falsely stating that Plaintiff is victim of "sexual abuse" and "sexual molestation" ("fabricated report").

15.     That day, Kimberly Roberts, a social worker of DCPP together with a detective, Brian Long, from the New Milford Police (Police) interviewed Plaintiff and showed him the book. Neither Roberts nor the Police were able to validate the false report or infer any reasonable suspicion of a crime. Plaintiff denied the entire report and denied the presence of any sexual abuse or sexual molestation. The Plaintiff also denied any sexual exploitation. Conterminously, neither Roberts nor the Police were able to validate or retrieve any similar words quoted by Aufiero and Mayer in the name of Plaintiff. Neither Roberts nor the Police framed the belief that Plaintiff had been a victim to a crime. Neither Roberts nor the Police noticed on Plaintiff any sign that may be construed as abuse. Neither Roberts nor the Police framed the suspicion or noticed on Plaintiff any sign that may be construed as injury. Neither Roberts nor the Police suspected any sign of abuse or harm done to Plaintiff. On the very same day, February 1, 2013, the Bergen County Prosecutor's Office closed the case, as there was no reasonable suspicion of a crime.

16.     Roberts and Zeron proceeded on a crusade to the detriment of Plaintiff to deprive Plaintiff of his right to personal privacy and dignity. The basis was the fabricated report in it of itself gave them the means to pursue Plaintiff.

17.     That evening Roberts imposed on Plaintiff a Section 4 Safety Protection Plan with the condition Safety Factor of #9 ("Safety Plan") at the direction of Zeron, her superior. Despite the absence of reasonable suspicion, Roberts at the direction Zeron imposed the Safety Plan that restricted Plaintiff's rights to be associated with his father without supervision by the Division. The Safety Plan deprived Plaintiff of the familial rights to be with his father. The Safety Plan was

placed indefinitely, until Plaintiff went through the AHCH Psychological, Social, and Physical ("AHCH") examination.

18.    The AHCH was a rigorous examination of a complete invasion of Plaintiff's personal privacy, especially in his private areas, thus physically assaulting Plaintiff. Under the AHCH Physical, Plaintiff was submitted to a microscopic examination to see in private areas if Plaintiff had any loose skin, which would show any inappropriate contact and alert for a rape examination. The microscopic exam looked for internal broken blood vessels or internal bruises throughout the entire body, an indication if there was any abuse, and involved looking for any bruises beneath the outer skin surface throughout the entire body. The AHCH exam results yielded no signs of loose skin, no broken vessels, no bruises, or any other evidence to assume any abuse or neglect has occurred or accrued. Plaintiff was also submitted to an AHCH Psychological and Social examination by an expert in detecting child abuse, which involved a mental examination to find any knowledge about sex or mental consequences or signs of trauma related to any abuse.

19.    On March 15, 2013, after the several AHCH examinations, it became confirmed as fact that whatever Aufiero and Mayer reported on February 1, 2013, about Y.Y. never happened. On March 15, 2013, the AHCH examination found that whatever false report Aufiero furnished in the name of Mayer concerning the safety and welfare of Mayer was false; that indeed **no one ever** violated Plaintiff.

20.    The system of not providing the education the Plaintiff was entitled to receive led to the damage of having an unqualified teacher (Mayer) who could not, would not and did not want to provide an education to Plaintiff. Despite the success with the IBC program, the withdrawal from IBC deprived Plaintiff of an education, caused Plaintiff to fall behind in educational goals, and became subject to a series of emotional abuse by staff of the School.

21.     In this course of psychological abuse, Plaintiff was also subjected to daily acts of abuse directly arising from Mayer and Elmera's malpractice towards Plaintiff.  In particular, the segregation Plaintiff from his peers and placing Plaintiff into a classroom that was not suitable for him, was an act that caused Plaintiff psychological trauma, followed by severe emotional distress. Aufiero and Elmera were fixated on subjecting Plaintiff to the treatment of ABA despite the approach being unsuitable for Plaintiff.  This subjected Plaintiff to a psychological confrontation where the School was so persistent about repeating ABA techniques despite its ineffectiveness, creating a confrontation where school personnel routinely humiliated Plaintiff due to the high expectations the School, Aufiero, Elmera and Mayer placed on the ABA.

22.     As a direct result, the Plaintiff has suffered from chronic depression that is now permanent, became mentally withdrawn from society, isolated from his peers in school and now from society, and continues to require medical treatment for depression.  Plaintiff now has a psychological depression that is now permanent, all that was nonexistent prior to the aforementioned torts.

## **PROCEDURAL HISTORY**

23.     On August 14, 2022, Plaintiff turned 18.

24.     On or about September 7, 2022, Plaintiff filed a notice of tort claim with Defendants Mayer, Aufiero, Elmera, and School.

25.     On August 12, 2023, Plaintiff filed the complaint.

26.     On December 13, 2023, the Defendants filed a pre-answer motion to dismiss.

## **STANDARD OF REVIEW**

27.      "Federal pleading rules call for a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal

of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v City of Shelby, Miss.*, 574 US 10, 11 (2014). "Federal Rules of Civil Procedure are designed to discourage battles over mere form of statement." *Id*. "Rule 8(a)(2) indicates that a basic objective of the rules is to avoid civil cases turning on technicalities." *Id*. "In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." *Id*.

28.     "Our decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)… A plaintiff, they instruct, must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v City of Shelby, Miss.*, 574 US 10, 12 (2014). A "complaint was not deficient" if it "stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city." *Id*. "Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." *Id*.

29.     The complaint stated simply, concisely, and directly events that the Plaintiff allege entitles him to a money judgment. The Defendants received the notice of tort claim and cannot claim to be ignorant of the facts upon which Plaintiff looks to be made whole.

30.     The Defendants' motion is cherry-picking the legal theory, by disregarding vital facts that were alleged and focusing on the form how Plaintiff articulated the legal theory. This method is inconstant with FRCP 8(a), which does not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted. Defendants cannot deny that the facts alleged in the complaint, when given a fair reading, show a tort committed by the

Defendants.  The complaint informs the dates, the events, and the details necessary to apprise the Court of how the Defendants wronged the Plaintiff.   Nothing more was required from Plaintiff.

31.    The motion to dismiss must be denied, because Defendants are not reading the complaint in the light most favorable to Plaintiff.  Rather, the Defendants focus on trying to minimize the significance of the tort they caused Plaintiff by disregarding essential facts, such as, Defendants argue that the Plaintiff did not suffer a "injury" arising from the fabricated report made by Mayer and Aufiero.  Defendants make such argument, despite Plaintiff, as a seven-year-old, was subject to an invasive intrusion of his private parts, directly triggered by the fabricated report created by Mayer and Aufiero.  The standard of review guides the Court to consider all pleaded facts in light most favorable to Plaintiff — not Defendants — and it is of no relevance the Defendants condescension of the complaint.

## I.    THE DEFENDANTS CAUSED PLAINTIFF MULTIPLE CONCRETE INJURIES.

32.    The first claim for relief focuses on the fabricated report that Mayer and Aufiero made about Plaintiff.  The Plaintiff had "the right to be free from fabricated evidence on the Fourteenth Amendment's guarantee of due process of law." *Halsey v. Pfeiffer,* 750 F.3d 273, 291 (3d Cir. 2014).  A plaintiff "may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence," the plaintiff would have not suffered a deprivation of a constitutional right. *Black v. Montgomery Cnty.,* 835 F.3d 358, 371 (3d Cir. 2016).  "The reasonable likelihood standard we employ simply requires that a plaintiff draw a meaningful connection between her particular due process injury and the use of fabricated evidence against her." *Id* at 372.  The claim is that the Mayer and Aufiero deprived the Plaintiff of his due process right to be free from fabricated evidence that was forwarded to a prosecutor, falsely entangling

Plaintiff in a crime that never happened, and as a direct result Plaintiff suffered a personal invasion of his personal privacy.

33.     The complaint is context specific that the Plaintiff suffered injuries from being subjected to an invasive exam of his body, the right to his privacy was violated, all arising from the fabricated report created by Mayer and Aufiero.  "The Fourth Amendment, applicable to the states through the Fourteenth Amendment, protects individuals against unreasonable searches of their persons, homes, and effects and guarantees the right to be free from unreasonable searches of one's unclothed body." *Crump v. Passaic Cnty.*, No. 2:14-2365 WHW, 2015 WL 1034653, at *4 (D.N.J. Mar. 9, 2015).  "The right not to have intimate facts concerning one's life disclosed without one's consent is a venerable right whose constitutional significance we have recognized in the past." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 179 (3d Cir. 2005).

34.     Contrary to the Defendants' arguments, Plaintiff contends that he was harmed by Mayer and Aufiero's fabricated report, leading to the event of having suffered an unreasonable search by having his body unclothed and searched in an invasive way.  Paragraph 95 in the complaint incorporates all the facts into the first claim for relief the very injury that Plaintiff suffered, an invasion of his unclothed body.  The Defendants dissatisfaction of the legal theory for damages is not enough to warrant dismissal.  Nonetheless, if the Defendants' cannot grasp the injury that they caused Plaintiff — from the very basic factual allegations stated simply, concisely, and directly listing events that, the Plaintiff allege entitle him to damages from the Defendants— then an amended complaint can cure that by repeating inside the section of the first claim for relief and articulating in greater graphic detail how the fabricated report that Mayer and Aufiero led to Plaintiff as a seven (7) year having his private parts photographed and examined by the State in an invasive exam. Because the standard cited from *Johnson* do not require the articulation of the legal

theory, the Defendants' argument that Plaintiff did not plead an "injury in fact" is without merit; all what Plaintiff was required to do, which he did, was to state simply, concisely, and directly events that, he alleges, entitled him to have Defendants compensate damages they caused.

35.    Likewise, the first claim for relief alleges that the fabricated report from Mayer and Aufiero injured the Plaintiff's "familial rights to have an association with his father." (ECF 1 ¶¶ 98-99). Contrary to Defendants, the right to familial relationship is not a speculative right, but "The right of parents to raise their children without undue state interference is well established." *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499 (1977). The right of the child to be with his parents, is no less significant than the right of the parents to be with their child. Here, the Plaintiff's familial right to be with his father was unjustly disrupted as a direct result of the fabricated report by Mayer and Aufiero.

## II.    MAYER AND AUFIERO ACTED UNDER THE COLOR OF LAW.

36.    Mayer and Aufiero, who are represented by attorneys that are employed and paid by the School, claim that they were not a "state actor" when making the fabricated report but functioned as a "private citizen." (ECF 23-1 p. 6). The paradox presented by Defendants is that the School is defending, at taxpayer costs, the conduct that Mayer and Aufiero committed as an alleged "private citizen," while on the School's payroll.

37.    The complaint alleges, "At all material times, Patricia Aufiero, Kelly Mayer-Regalbuto, and Nicole Elmera were employees of the School." (ECF 1 ¶ 14). In the report of the

fabricated evidence created by Mayer and Aufiero, the reporters are identified as "school staff," and not as a private citizen.

38.     Defendants arguments are ignoring the plain text of 42 USC 1983, which applies to "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"  The statute applies to "every person." The question turns on whether Mayer and Aufiero acted under the color of state law.  The short answer is yes.

39.     The plain definition of color of law, "The appearance or semblance, without the substance, of legal right."  Black's Law Dictionary, 2nd Edition, 1910, citing *McCain v. Des Moines*, 174 U.S. 168 (1899). "'Color of law' does not mean actual law. 'Color,' as a modifier, in legal parlance, means 'appearance, as distinguished from reality.'" *McCain* at 175. "The term 'color of law' means the misuse of power made possible because the wrongdoer is clothed with the authority of the state." *Chambers v. York Cnty*. Prison, No. 1:18-CV-2386, 2021 WL 1212532, at *5 (M.D. Pa. Mar. 31, 2021). The "essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997).

40.     The Defendants invoke that Mayor and Aufiero fabricated the false report according to N.J.S.A. 9:6-8.10, which states "Any person having reasonable cause to believe that a child has been subjected to child abuse, including sexual abuse, or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or

otherwise." N.J.S.A. 9:6-8.10. As such, Defendants cannot deny that they acted under the color of state law when creating the fabricated report; the color of law is N.J.S.A. 9:6-8.10.

41.     A person who acts under N.J.S.A. 9:6-8.10 is a state actor. "We discern in N.J.S.A. 9:6–8.10 a legislative intent to impose a universal obligation to report child abuse whenever a person forms a reasonable belief that a child has been subjected to child abuse." *L.A. v. New Jersey Div. of Youth & Fam. Servs.*, 217 N.J. 311, 316–17, 89 A.3d 553, 556 (2014). "We hold that, in light of the statute's language and history, the reasonable belief threshold requires an objective assessment of whether given all of the facts and circumstances known at the time a person similarly situated would have held a reasonable belief that child abuse had occurred." *Id*. As such, when Mayer and Aufiero created the fabricated false report about Plaintiff, they did so under N.J.S.A. 9:6-8.10 without the legal right (duty) to do so.

42.     As to whether Mayer and Aufiero functioned as a private citizen or an employee of the School, the evidence that Plaintiff has of the fabricated report created by Mayer and Aufiero, the reporter is identified as "school staff", and not as a private citizen. The complaint alleges, "At all material times, Patricia Aufiero, Kelly Mayer-Regalbuto, and Nicole Elmera were employees of the School." (ECF 1 ¶ 14). In particular, Roberts and Zeron imposed the Safety Protection Plan as a direct result of the fabricated evidence created by Mayer and Aufiero against Plaintiff. The complaint states detailed facts, that neither Roberts nor Zeron had any reasonable basis for the crime prior to subjecting Plaintiff to the invasive exam and disruption of familial rights. (ECF 1 ¶¶ 53-60). The only colorable basis that Roberts and Zeron had, if any, was Mayer and Aufiero's fabricated report, stating "school staff" have knowledge that the Plaintiff is a victim of child and sex abuse. By invoking that term "school staff", Aufiero and Mayer gave credibility to the fabricated report, with the impression as if Mayer and Aufiero know something that an objective

investigator would not spot from an interview with Plaintiff. This resulted in the special injury that Plaintiff suffered, an invasive exam of his body being unclothed and the disruption of his familial rights. Thus, Plaintiff has thus met the burden of showing that Mayer and Aufiero functioned as state actors. The Defendants do not cite any case law showing that in such circumstances Mayer and Aufiero would not be a State Actor to negate the plausibility of Plaintiff's factual allegations.

43.     Moreover, even if considering Mayer and Aufiero's action as one of a private citizen, they could still be liable as a State Actor, because Mayer and Aufiero invoked the state authority to investigate child abuse for the purpose of harming Plaintiff. "Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, … our cases have found state action when private parties make extensive use of state procedures with the overt, significant assistance of state officials." *Edmonson v. Leesville Concrete Co*., 500 U.S. 614, 622 (1991). "This prong of the test only asks whether the private actor who caused the harm to another person was acting in conformity with the law of the jurisdiction when he caused the harm." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1144 (3d Cir. 1995). The second prong asks, "whether, all things considered, it is fair to hold that Enterprise is engaged in state action." *Id* at 1145.

44.     The fabricated report of the Mayer and Aufiero acted under the N.J.S.A. 9:6-8.10 to activate the Roberts and Zeron, employees of DCPP, to injure the Plaintiff. There was no authority nor obligation under N.J.S.A. 9:6-8.10 to fabricate a report of child abuse where no knowledge of abuse exists. There is also no duty under N.J.S.A. 9:6-8.10 to fabricate a false report of child abuse, merely because a disgruntled teacher wants to avenge the improper placement of a student in her classroom. N.J.S.A. 9:6-8.10 is a statute designed to investigate genuine concerns

of child abuse.   The misuse N.J.S.A. 9:6-8.10 when no abuse existed is similar to a false alarm, when a party misuses 911 to call an emergency hotline triggering a panic for the government officials to do a swatting and a warrantless search of someone's private home.

45.     Here, the complaint alleges context specific facts, that Mayer and Aufiero created a fabricated report of child abuse where none existed.  Mayer and Aufiero functioned as state actors when employing the DCPP to investigate Plaintiff, the intention solely to harm Plaintiff. Defendants explain the color of state law, that Mayer and Aufiero acted under N.J.S.A. 9:6-8.10.

### III.     PLAINTIFF'S DISABILITY IS A PROTECTED CLASS

46.     The complaint articulated detailed facts of how Plaintiff had disabilities, requiring special education, and was removed from the IBC program merely because he did not welcome the mistreatment of the ABA learning model.   As a direct result, Plaintiff was placed in the classroom of Mayer, where he was "admonished and ridiculed for being autistic." "As a direct result, Plaintiff developed extreme anxiety of the and would spend every day crying and sobbing for hours, and yet unable to articulate his frustrations due to his learning disabilities."   "The Plaintiff's parents were frustrated by this malpractice deployed by the School. Plaintiff's parents would repeatedly ask Aufiero and Elmera to correct the error by returning Plaintiff to the [IBC] program, and yet Aufiero and Elmera paid no attention to Plaintiff's state of mistreatment."   "To make matters worse, for the following academic year of 2012-2013, the School made Plaintiff continue another year in the classroom of Mayer." "Thereafter, Mayer became hostile to Plaintiff and orchestrated a scheme to personally injure Plaintiff in the hopes of having Plaintiff removed from her classroom." (ECF 1 ¶¶ 16-45).

47.     The complaint then defines the scheme, the fabricated report created by Mayer and Aufiero (ECF 1 ¶¶ 46-60) stating specific factual allegations, "The system of not providing the

education the Plaintiff was entitled to receive led to the damages of having an incompetent teacher (Mayer) who could not, would not and did not want to provide an education to Plaintiff." "Despite the success with the IBC program, the withdrawal from IBC deprived Plaintiff of an education, caused Plaintiff to fall behind in educational goals, and became subject to a series of emotional abuse by staff of the School." "In this course of psychological abuse, Plaintiff was also subjected to daily acts of abuse directly arising from Mayer and Elmera incompetence towards Plaintiff. In particular, the segregation Plaintiff from his peers and placing Plaintiff into a classroom that was not suitable for him, was an act that caused Plaintiff psychological trauma, followed by severe emotional distress." "Aufiero and Elmera were fixated on subjecting Plaintiff to the treatment of ABA despite the approach being unsuitable for Plaintiff. This subjected Plaintiff to a psychological confrontation where the School was so persistent about repeating ABA techniques despite its ineffectiveness creating a confrontation where school personnel routinely humiliated Plaintiff due to the high expectations Aufiero and Elmera placed on the ABA techniques." "The Plaintiff has since suffered from chronic depression that is permanent, became mentally withdrawn from society, isolated from his peers in school and now from society, and continues to require attending medical treatment for this depression." (ECF 1 ¶¶ 89-93).

48.     Despite these articulate facts, pleaded in great detail, Defendants falsely proclaim, "Plaintiff has pled no facts regarding the second element. He has not alleged that Mayer-Regalbuto and Aufiero engaged in a conspiracy that was motivated by racial or class-based discriminatory animus." (ECF 23-1 p. 14).  It has to be repeated, for the sake of clarity, Defendants are not entitled to dismissal by conveniently shutting their eyes to the factual allegations in the complaint.

49.     The very caselaw cited by Defendants, *Lake v. Arnold*, found "an animus directed against the mentally retarded includes the elements of a 'class-based invidiously discriminatory'

motivation" and "The plaintiffs have succeeded in stating a cause of action pursuant to 42 U.S.C.1985(3)" for discrimination of the "the mentally retarded." *Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir. 1997). As such, the complaint articulating Plaintiff's factual basis of his learning disabilities and the mistreatment in great detail was required to do no more as an adequate statement of his claim for 42 USC §§ 1985(3) and 1986. Defendants' fixation on whether Plaintiff articulated "the conspiracy that was motivated by racial or class-based discriminatory animus" (ECF 23-1 p. 8) misplaces the focus on the legal theory. FRCP 8(a) does not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.

### IV.    PLAINTIFF HAS ADEQUATELY PLED THE LIABILITY OF THE SCHOOL.

50.    The complaint has identified with specific facts the events surrounding the Plaintiff's correct placement and wrongful removal from the IBC. The placement of the Plaintiff in the IBC was correct pursuant to 20 U.S.C.A. § 1413(e)(4)(B), as the School had a specific duty imposed by federal law to provide Plaintiff with an education in the "least restrictive environment," for which School received grants and benefits flowing from federal funding. The complaint alleges, "The [IBC] was created to comply with the requirement that children with disabilities be educated in a least restrictive environment." (ECF 1 ¶ 22). The complaint also provides specific facts of how Plaintiff was succeeding in the IBC, and how the removal of the Plaintiff from that program was due to an animus "the School directed Aufiero and Elmera on following the ABA model since the State and insurance acknowledge and reimburse only ABA treatment, whereas other treatments, albeit effective, do not receive funding." (ECF 1 ¶ 30). The complaint goes on with specific factual allegations of how the School removed the Plaintiff unilaterally from the IBC, because the Plaintiff had declined the mistreatment of the ABA model. The Defendants contend that these alleged facts are not specific enough to appraise them of their liability.

51.     The Court should take judicial notice of the School's own explanation of the IBC on its website and the School's own statement.  "The Inner Bridge Crossing (IBC) program, designed to service children with social, relational and communicative disabilities, including Asperger's Syndrome, high-functioning autism, and nonverbal learning disabilities, was developed in 2009 in the PreK and has since grown to meet the needs of students K-12." (a true copy is attached as Exhibit A).  During the year of 2011, the same time Plaintiff was in the IBC program, Ray Dorso, the then Director of the Special Needs for the School explained that the children, like Plaintiff, who are on the autistic spectrum are "the most vulnerable" students in the School.  The IBC program was used to prevent six (6) students from leaving to other schools at the School's expense, and it was important for the School to establish the IBC to be "fiscally responsible." Patch, *Inner Bridge Crossing Presentation*, https://patch.com/new-jersey/newmilford-nj/inner-bridge-crossing-presentation.

52.     In 2011, Plaintiff was one of the six (6) students that the School was able to retain because of his placement in the IBC.  The complaint adequately alleges that the removal of Plaintiff from IBC was directed at misplacing the Plaintiff from the least restrictive environment, and the removal was motivated to collect the State and insurance funding that the School was receiving in employing ABA model.

53.     The Defendants convolute the basis of the third claim for relief with the theory of vicarious liability under the *respondeat superior*, discussed in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).  The essence of *Monell* is that the Plaintiff must allege specific facts that the municipality caused the tort other than employing a tortfeasor, "the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such

causation was absent." *Id* at 692.  *Respondeat superior* liability is possible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id* at 694. The goal is a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

54.    Here, the complaint identified specific reasons why the School is liable.  First, the Plaintiff specifically alleged the reckless disregard of the School's duty to Plaintiff's rights for an education in the least restrictive environment.  "The School acted towards Plaintiff in reckless disregard of his rights by removing Plaintiff from the IBC and placing Plaintiff in a classroom with Mayer, a teacher who was not competent to educate Plaintiff. The School acted so, at the expense of Plaintiff's safety and education, to serve its own interest of advancing the ABA, due to financial incentives the School was receiving from practicing ABA." (ECF 1 ¶ 115). The complaint alleged specific facts about the reckless removal from IBC, the motive (financial incentives of ABA) and the person who did removal (Aufiero and Elmera).  Although the complaint does not specify so, at all relevant times, Aufiero was the School principal with final decision-making power on the placement of a student (a factual allegation that can easily be added to an amended complaint). The complaint also alleged that Mayer was incompetent as a teacher for Plaintiff (due to her lack of training in the disabilities Plaintiff faced). (ECF 1 ¶¶ 37-38).

55.    In particular, even "a single act by a decisionmaker with final authority in the relevant area constitutes a policy attributable to the municipality itself." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  The removal of Plaintiff from IBC and

placing him with a teacher that was not qualified in autism, was in itself an act of reckless disregard, done by Aufiero, the principal of School to constitute final-official school policy.

56.    To establish "deliberate conduct, the municipality was the "moving force" behind the injury alleged." *Id* at 404.  "In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id* at 405.

57.    The degree of culpability is in the School itself, because the duty to provide Plaintiff with an education in the least restrictive environment was a duty that belonged solely to the School. In later cases building on *Monell*, hold "that a municipal entity may be liable when its policymakers made a deliberate choice from among various alternatives to follow a particular course of action." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149 (3d Cir. 1995). The School had an independent duty, independent of the duties owed by the other Defendants, to ensure that the Plaintiff is placed in a classroom that is suitable for him.  Thus, Aufiero removed Plaintiff from IBC and placed him with a teacher that was not qualified in the education of Plaintiff's disabilities, was in itself a deliberate choice, an act of with the degree of culpability, done by Aufiero, the principal of School to constitute final-official school policy.  The choice the complaint alleges, was to displace the Plaintiff from IBC due to the School's desire to prioritize the ABA model for its financial incentive in utter disregard to Plaintiff's right to an education.

58.     The deliberate indifference is in employing the ABA model on Plaintiff, despite the model being completely improper for Plaintiff.  These facts need to be further articulated in greater detail (perhaps in an amended complaint): the strategy for the School placing Plaintiff in Mayer's classroom, was due Mayer employing the ABA model even if it was not suitable to Plaintiff.  Given that Mayer did not have competent training to work with children with disabilities similar to Plaintiff's situation, the School took that very opportunity to cash in on the ABA model, by taking for granted that Mayer could be asked to employ the ABA model without having the ability to discern whether the ABA model is effective or not on a child with Plaintiff's disabilities.  Much of the injury that Plaintiff faced in Mayer's classroom, in "getting admonished and ridiculed for being autistic" (ECF 1 ¶ 41) was due to the fact that Plaintiff was not amendable to the ABA model.  The repeated attempt forcing Plaintiff to follow the instructions of the ABA model created the very confrontation of Mayer having great hopes in the ABA model while in reality being ineffective with Plaintiff, that Mayer would ridicule Plaintiff for being too disabled to cope with the learning environment.

59.     Under these circumstances, the School placing Plaintiff in Mayer's classroom, pressing on Plaintiff the ABA model despite its ineffectiveness, created the very hostility that motivated Mayer to create the fabricated report.  In other words, if not for the School misplacing Mayer as the teacher of Plaintiff, the tort of the fabricated report and its tort that followed would not have happened.  Yet, when it came to the fabricated report, it was Aufiero, the School principal, that transmitted and gave life to the fabricated report.

60.     Moreover, this case is one of the "limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's

culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id*. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id*. The School had an independent duty of providing Plaintiff with an education in the least restrictive environment, and the School having placed Plaintiff into the classroom of Mayer, a teacher who had no training nor experience in working with the disabilities of Plaintiff, led to the very injury that followed Plaintiff and has caused him perpetual injuries.

61.    Here, the specific facts that the School had actual knowledge of Plaintiff's disabilities via the IEP are pleaded.  The removal of Plaintiff from the IBC was an act of deliberate indifference to Plaintiff's rights, based on his disabilities, to receive education in the least restrictive environment.  The School placed Plaintiff into the classroom of Mayer, a teacher who had no training or qualifications for working with the disabilities that Plaintiff faced.  The duty of providing Plaintiff with an education in the least restrictive environment was on the School, through personnel who are qualified to treat Plaintiff's disabilities, and the School should have anticipated causing Plaintiff lifelong injury when it deliberately misplaced Plaintiff from the IBC into Mayer's classroom.  These specific facts are detailed enough to show the School's liability even under *Monell*.

**V.    DEFENDANTS KNEW THAT THE FABRICATED REPORT CAUSED ROBERTS AND ZERON WERE INTERFERING WITH PLAINTIFF'S CONSTITUTIONAL RIGHTS BUT DID NOTHING TO STOP IT.**

62.    Defendants take issue as to whether the Plaintiff stated a cause of action under 42 USC 1986.

63.    "§ 1986 constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985, and "transgressions of § 1986 by definition depend on a preexisting violation of § 1985." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).  "Additionally, a § 1986 plaintiff must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Id*.

64.    As for the § 1985 claim the only element Defendants contest on is whether the complaint alleged that "class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws." (ECF 23-1 p. 7-8). As shown in *supra*, Point III, Plaintiff's disability is a protected class.  The factual events giving rise to the § 1986 claim have been adequately pled, and the Defendants offer no dispute to that.

65.    As for the § 1986 claims, the complaint has alleged sufficient facts that Mayer and Aufiero (individually and as the School principal) created the fabricated report.  All of the Defendants had actual knowledge of a § 1985 conspiracy to deprive Plaintiff of his constitutional rights.  That is, after Roberts and Zeron targeted Plaintiff with the so-called "Safety Protection Plan," Plaintiff's mother repeatedly reached out to Elmera, Aufiero (as the principal) and Mayer asking them to end this fabricated report, so Plaintiff can have his dignity and familial relationship with his father restored.  The Defendants had the power to prevent the continuation of the fabricated report by informing Roberts and Zeron that none of them have actual knowledge of the

child abuse about Plaintiff.  The School, Aufiero (as the principal), Mayer and Elmera aided in the

commission of a § 1985 violation by affirming Roberts (after the Safety Protection Plain was in

place), by stating that they did have knowledge that Plaintiff was a victim of child abuse.  The

Defendants' refusal (or neglect) to correct their reporting allowed Roberts and Zeron to continue

their invasion of Plaintiff's protected rights, including pursuing an invasive examination of

Plaintiff's intimate parts.  As such Plaintiff has adequately alleged § 1986 claims.

## VI.    PLAINTIFF HAS ALLEGED VALID CLAIMS FOR RECOVERY FOR HIS DENIAL OF EDUCATION DUE TO A DISABILITY.

66.    The Defendants wrongly focus on the legal theory of the fourth claim for relief as

not actionable as a breach of contract and under IDEA.

67.    The fourth claim is composed of several issues that may seem to overlap but are

one.  First, there is the Americans with Disabilities Act (ADA) claim under 42 U.S.C. § 12133,

where Plaintiff was excluded from the IBC on the basis that his disability cannot be treated with

ABA, consistent with the types of discrimination that Congress codified in 42 USC 12101(a) as

unlawful.  Second, there is the First Amendment right to disagree with the ABA model and not

face retaliation ("The law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions, including criminal

prosecutions, for speaking out." *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2024)).  Third, Plaintiff

seeks compensatory damages for injuries caused by the removal of Plaintiff from the IBC.  All of

these claims arise from the denial of an adequate education in the IBC under the IEP or IDEA.

Either way — regardless of whether coined as a breach of contract, denial of education on the basis

of a disability or a retaliatory measure — a Plaintiff seeking compensatory damages for a "past

denial of a free and appropriate education may nonetheless proceed without exhausting IDEA's

administrative processes if the remedy a plaintiff seeks is not one IDEA provides." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023).

68.    The Third Circuit case law that Defendants cite from *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 803-05 (3d Cir. 2007) for the proposition that § 1983 is not available to enforce violations of IDEA has been abrogated by more recent precedent form the Supreme Court. "The statute's administrative exhaustion requirement applies *only* to suits that seek relief also available under IDEA. And that condition simply is not met in situations like ours, where a plaintiff brings a suit under another federal law for compensatory damages—a form of relief everyone agrees IDEA does not provide." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 147–48 (2023).  Also see *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 168 (2017) (it is "true even when the suit arises directly from a school's treatment of a child with a disability—and so could be said to relate in some way to her education. A school's conduct toward such a child—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA.  A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to § 1415(l)'s exhaustion rule").

69.    Similarly, the Supreme Court squarely rejected the Defendants sentiment that, "The school district protests that these provisions impose only procedural requirements—a checklist of items the IEP must address—not a substantive standard enforceable in court."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 401–02 (2017).  The Supreme Court rejected that argument and held, "But the procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to meet the unique needs of a child with a disability. §§ 1401(9), (29)." *Id* at 402.

70.    Similarly, the Third Circuit held that "a school district is never relieved of its legal obligations under the IDEA." *Abigail P. through Sarah F. v. Old Forge Sch. Dist.,* 105 F.4th 57, 66 (3d Cir. 2024). "When a party challenges the implementation of an IEP, the heart of the issue is whether any deviation whatsoever from an IEP necessarily violates the IDEA, and—if not— how far is too far." *Id* at 65.  A "party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Id*.

71.    Here the Plaintiff provided a context specific claim, that the IEP provided that Plaintiff's placement was in the IBC.  Plaintiff was removed unjustly from the IBC because the Defendants desired employment of the ABA model and Plaintiff's disability was unresponsive to that mistreatment.  Plaintiff's parents and first teacher both voiced opposition to the use of ABA, as an ineffective tool for Plaintiff's disability, and the School, Aufiero and Elmera retaliated by unilaterally removing Plaintiff from the IBC.  The injuries that befall Plaintiff, arises directly from the failure to implement the IEP, by misplacing Plaintiff from the IBC.

72.    Contrary to the Defendants' contention over whether an IEP is a contract, in this District it was already found, "Although the boilerplate language in the document advises Plaintiff that he may write to the agency in the event the Board fails to alter the student's IEP in accordance with the terms of the settlement, it is well established that Plaintiff may also seek enforcement of the agreement by filing suit for breach of contract." *C.H. ex rel. M.H. v. Jefferson Twp Bd of Educ.*, No. CIV.A.05-39(HAA), 2005 WL 4122172, at *6 (D.N.J. Dec. 20, 2005) (citing *D.R. v. M.R. v. E. Brunswick Bd. of Educ.,* 109 F.3d 896, 901 (3d Cir. 1997), or under 42 U.S.C. § 1983, *McClendon v. Sch. Dist. of Phila.*, No. 04–1250, 2004 WL 2440661, at *2 (E.D.Pa. Oct. 29, 2004)).

Indeed, the IDEA allows pursing "remedies. A 'remedy' denotes 'the means of enforcing a right,' and may come in the form of, say, money damages, an injunction, or a declaratory judgment. … The statute then proceeds to instruct that nothing in IDEA shall be construed as restricting or limiting the availability of any of these things 'under' other federal statutes like the ADA." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 147 (2023).

73.    Now as to whether the IEP is an actual contract is an immaterial contention. The IEP provides actionable rights that allow seeking a remedy for its violation and the Plaintiff is looking for compensatory damages for the Defendants failure to implement the IEP. What motivated the failure to implement the IEP may be actionable under different legal theories, but nothing precludes Plaintiff from seeking such recovery, and FRCP 8(a)(2) do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.

74.    In the same sense, the injury is also actionable against Aufiero and Elmera individually as both of them acted with the animus to harm Plaintiff for his rejection of the ABA. Whether Aufiero and Elmera were actual parties to the IEP is not the correct focus (even though they were), because the legal remedy of Plaintiff is against the person who caused the tort.

## VII.    PLAINTIFF ADEQUATELY ALLEGED A DEFAMATION AGAINST MAYER AND AUFIERO

75.    In the appeal of Plaintiff's father, Y.W. looked to file a late notice of claim, the Appellate Division found that "The complaint Y.W. would file, if permitted, would allege defamation. We need not repeat the alleged defamatory statement, particularly due to its sensitive nature. For the same reason, we have identified the claimant only by his initials. It suffices for our present purposes to set forth the following undisputed facts." *Y.W. v. New Milford Pub. Sch.*, No. A-5978-12T4, 2014 WL 4636380, at *1 (N.J. Super. Ct. App. Div. Sept. 18, 2014). "The cause of action that Y.W. would present—if permitted by the outcome of this appeal—**sounds in**

**defamation**, which requires proof of (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *Id* at *2 (emphasis added).

76.    In that appeal, arising from the same fabricated report, the same Defendants insisted that the claim "sound in defamation" as made and completed on February 1, 2013, and not on March 21, 2013, as contended by Plaintiff's father the date the DCPP closed its investigation. "Judicial estoppel, sometimes called the 'doctrine against the assertion of inconsistent positions,' is a judge-made doctrine that prevents a litigant from asserting a position inconsistent with one that he has previously asserted in a previous proceeding." *Est. of Roman v. City of Newark*, 914 F.3d 789, 805 (3d Cir. 2019). The Defendants having prevailed in that appeal that the only actionable claim was defamation are bound by the law of the case and judicial estoppel that the report made by Mayer and Aufiero "sounds in defamation" and based on the Defendants representation in that proceeding, Y.W.'s motion to file late notice of claim was denied.

77.    Defendants now asserts that Plaintiff did not suffer an injury, because "the statements which indicated he was a young child who was a victim of abuse would have led a reasonable person of ordinary intelligence to view Plaintiff with sympathy and kindness and offer him assistance" and that the defamation was directed against the father, not Plaintiff. (ECF 23-1 p. 17-18).  Defendants offer no meaningful explanation as to the sympathy and kindness and assistance to make Plaintiff whole, the fabricated report casted Plaintiff in a negative light, causing a change of status as a "victim", that subjected Plaintiff to an invasive examination of his private areas. In fact, the Defendants show no sympathy; their motion omits addressing the injuries Defendants directly caused to Plaintiff, since Defendants are trying to avoid having the special harm connected directly traced to the casting of Plaintiff in a false light.

78.     Contrary to the Defendants, "A defamatory statement is one that is false and is injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others." *Hyman v. Rosenbaum Yeshiva of N. Jersey*, 258 N.J. 208, 236, 317 A.3d 1260, 1276 (2024). "Certain kinds of statements denote such defamatory meaning that they are considered defamatory as a matter of law. A prime example is the false attribution of criminality." *Romaine v. Kallinger*, 109 N.J. 282, 291, 537 A.2d 284, 288 (1988). "Slander is actionable Per se, that is, without charge or proof of special damages, when the false statements (1) charge commission of a crime, (2) impute certain loathsome diseases, (3) affect a person in his business, trade, profession or office, or (4) impute unchastity to a woman." *Arturi v. Tiebie*, 73 N.J. Super. 217, 222, 179 A.2d 539, 541 (App. Div. 1962). "If the defamatory statements are not within any of these four categories, plaintiff must prove that the utterance thereof was the legal cause of some special harm." *Id*. "once the cause of action is established by the proof of pecuniary loss, the bars are lowered and general damages may be recovered for his (plaintiff's) wounded feeling and humiliation and resulting physical illness. In other words, such damages are insufficient in themselves to make the slander actionable, but once the cause of action is made out without them, they may be tacked on as 'parasitic' to it." *Id* at 222–23.

79.     Plaintiff has adequately pleaded a claim for defamation, consistent with *Arturi,* by showing the false statement about Plaintiff "was the legal cause of some special harm," whereby the Plaintiff was subjected to an invasion exam of having his body unclothed and his private parts examined by the State, his connection with his father was disrupted, and that Roberts and Zeron intruded into Plaintiff's private medical records.  These special harms are directly attributed to the Mayer's and Aufiero's fabricated report concerning Plaintiff.

80.    Unlike the New York case law cited by the Defendants, that does not recognize a tort for false light that causes an invasion of privacy.  "New Jersey recognizes invasions of privacy involving publicity that unreasonably places the other in a false light before the public." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 183 (3d Cir. 2020).  "Like defamation, a fundamental requirement of the false light tort is that the disputed publicity be in fact false, or else at least have the capacity to give rise to a false public impression as to the plaintiff." *Id*.  Here, the fabricated report of Mayer and Aufiero was made to a public entity with the false impression that Plaintiff is a victim of child abuse, which led to a direct invasion of Plaintiff's right to privacy.

## <u>CONCLUSION</u>

Wherefore Plaintiff requests that the Court enter an order denying the motion to dismiss filed by Defendants Kelly Mayer- Regalbuto, Patricia Aufiero, Nicole Elmera, and New Milford Board Of Education a/k/a New Milford Public School District.

Dated: Newark, NJ

January 29, 2024

Respectfully submitted,

Lawrence Katz, Esq.
Law Offices of Lawrence Katz,
464 Malbone Street, Suite 101
Brooklyn, NY 11225

Attorney for Plaintiff